UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**GREGORY E. WILSON,**

        **Plaintiff,**                  **CIVIL ACTION NO. 08-11925**

    vs.

                                    **DISTRICT JUDGE DAVID M. LAWSON**

**COMMISSIONER OF**              **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

        **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**I.**     **RECOMMENDATION:**     This Court recommends that Defendant's Motion for Summary Judgment (docket no. 22) be GRANTED, Plaintiff's Motion for Summary Judgment (docket no. 16) be DENIED, and the instant Complaint DISMISSED.

\*\*\*

**II.**     **PROCEDURAL HISTORY:**

Plaintiff filed an application for a period of disability and Disability Insurance Benefits and Supplemental Security Income on May 18, 2004, alleging that he had been disabled since October 26, 2002[1] due to glaucoma symptoms, hypertension, high cholesterol, diabetes, bilateral rotator cuff tears and status post three shoulder surgeries, depression and shortness of breath due to exposure to asbestos. (TR 21, 380-83). The Social Security Administration denied benefits. (TR 21, 370). A requested *de novo* hearing was held on October 6, 2006 and continued on March 15, 2007 before

---

[1]Plaintiff's original application alleged an onset date of January 1, 1999 and at the hearing his attorney requested to amend the onset date. (TR 21, 642).

Administrative Law Judge (ALJ) John W. Belcher who subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits and did not qualify for Supplemental Security Income because he was not under a disability at any time from October 26, 2002 through the date of the ALJ's June 8, 2007 decision[2]. (TR 29, 640, 670). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 10-12). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

### III.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

#### A.   Plaintiff's Testimony

Plaintiff was forty-six years old at the time of the administrative hearing. (TR 644). Plaintiff has a high school education, was in the military and has past work experience as a laborer, cook and cashier/clerk. (TR 400, 647-49, 693). Plaintiff lives with his wife and three children in a two-story house. (TR 645-46). Since October 2002 Plaintiff has worked part-time as a cashier in his sister's store off and on for two to three years. (TR 646-47, 674). Plaintiff also tried part-time work as a cook. (TR 647, 674). Plaintiff testified that since 1999 the longest period he had worked was six months. (TR 693). As a cashier/clerk, Plaintiff testified that he had difficulty performing tasks such as lifting and mopping, he fought with his sister and his co-workers and he was forgetful with respect to tasks to complete at the end of his shift. (TR 693-94).

Plaintiff testified that for his diabetes he tests his blood sugar levels only in the morning, a

---

[2] Claimant filed a prior application for Disability Insurance Benefits on December 7, 2000. (TR 59). A hearing was held on September 9, 2002 before Administrative Law Judge William J. Musseman who subsequently found that Plaintiff was not under a disability at any time through the date of the October 25, 2002 decision. (TR 68).

normal value is below 110 and all of his readings are over 110, usually by 50 points. (TR 697). Plaintiff described being jittery, anxious and sweating when his sugar is high. (TR 698). Plaintiff has been prescribed insulin, Glucotrol and Glucophage/Actos. (TR 698). Plaintiff also reports low blood sugar and dizziness as a side effect to the medications. (TR 699). Plaintiff testified that as a result of his diabetes he is very tired. (TR 701).

Plaintiff also complains of numbness in his feet, legs, hands and fingers. (TR 702). He testified that he gets pain and numbness from walking and he finds stairs difficult. (TR 712-13). Plaintiff testified that he falls about once a month and ice, snow and wet conditions make falling more likely. (TR 715). Plaintiff testified that he can stand for ten minutes before he has pain and putting his feet up to recliner level helps to alleviate the pain. (TR 714). He testified that he is prone to dropping things due to the numbness. (TR 702-03).

Plaintiff complains of pain in his neck and spine which developed in the 1990s at the time he had his shoulder surgeries. (TR 703-04). Plaintiff testified that his back, neck and shoulder pain is treated with pain medication and injections. (TR 706). Plaintiff reports that he has shoulder pain when he completes personal care tasks or vacuums. (TR 416, 703, 711). Otherwise, he does not engage in any activities around the house except watching television and reading magazines. (TR 415, 710-11). Plaintiff rated his pain as a five on a ten-scale with flares about twice a month up to level six or seven. (TR 707). Plaintiff testified that the frequency of his flare ups is "kind of" more often than in the past. (TR 708). Plaintiff takes one Vicodin every six hours and testified that the Vicodin brings his pain down to a five on a scale of ten, but it also makes him dizzy, tired and nauseous. (TR 709). Plaintiff also takes Cymbalta. (TR 709). Plaintiff has trouble sleeping due to pain in his shoulders and takes Trazodone to help him sleep. (TR 715).

**B.     Medical Record**

Plaintiff has a history of treatment for hypertension, Type II diabetes, glaucoma and chronic shoulder pain. (TR 426). The record also shows a history of depression. In 1998 Plaintiff underwent a right shoulder arthroscopy, acromioplasty and open distal clavicle excision. (TR 179). In June 1999 Plaintiff underwent a left shoulder arthroscopy, arthroscopic subacromial decompression and open distal clavicle excision. (TR 194). Plaintiff continued to complain of shoulder pain following the surgeries. (TR 312, 314).

Plaintiff treated at Northeast Michigan Community Mental Health (NMCMH) and their affiliates from January 2004 through March 2007. (TR 483-85, 601-639, 678). In March 2004 he was diagnosed with moderate Major Depressive Disorder, a single episode (TR 483). Plaintiff was prescribed Wellbutrin as an antidepressant and Ambien as a sleep aid. (TR 489, 436). March 2004 notes from Alcona Health Center show that Plaintiff was taking Elevil for his depression and Glucotrol for his diabetes. (TR 436). In November 2004 Plaintiff was taking Lexapro for depression and there was a noted improvement. (TR 554). NMCMH completed a psychiatric evaluation dated November 29, 2006 and concluded that Plaintiff has severe recurrent Major Depressive Episodes without psychotic features (296.33) and assigned a GAF of 35. (TR 599). Russell G. Williams, D.O., Psychiatrist, noted that Plaintiff "has been on antidepressants in the past, but admits he had never given them a full trial." (TR 599).

With respect to Plaintiff's physical impairments, he has exhibited fair to good control of his hypertension with medication. (TR 436, 445, 447, 451, 470, 474, 530, 535, 547, 554). An August 2004 X-ray of Plaintiff's cervical spine showed cervical disc disease "seen purely in the form of osteophytes at C5/6 without disc space narrowing seen at this or any cervical level" and a suggestion of relative foraminal narrowing on the right at C3/4. (TR 562). Bradley T. Van Assche, M.D., noted

a "relative stenosis . . . no more than mild." (TR 562).

In April 2005 Plaintiff reported shoulder pain and was given injections. (TR 551). In July 2005 Dr. Van Assche, M.D., performed a chest exam on Plaintiff, including x-rays and concluded that Plaintiff had "at least borderline cardiomegaly." (TR 546). In May 2006 Plaintiff reported persistent shoulder and neck pain and it was noted that "Motrin helps best." (TR 534). On May 5, 2006 Plaintiff underwent a chest x-ray and EKG as a result of chest pain. The stress EKG was negative and the scan showed "no evidence for perfusion abnormalities by gated SPECT imaging." (TR 532).

The medical records from August 2006 contain notations of peripheral neuropathy and noted that Plaintiff "needs Doppler study." (TR 530). Plaintiff underwent an EMG in November 2006 with Jorge T. Gonzalez, M.D. (TR 585). Dr. Gonzalez noted that the "EMG of the lower extremities demonstrated minimal findings," the prolonged F-wave latencies in isolation were nonspecific and the "possibility of a mild generalized polyneuropathy is a consideration, although the electrodiagnostic findings do not fulfill diagnostic criteria for this diagnosis." (TR 585). In December 2006 by E. Montasir, M.D., noted reduced pinprick sensation in the lower extremities consistent with peripheral neuropathy. (TR 571). A December 2006 medication log shows that Plaintiff was taking Lexapro, Neurontin, Cymbalta and Trazodone. (TR 595). Plaintiff underwent an arteriogram on April 11, 2007 and an angioplasty was performed to reduce a 70-80 percent stenosis of the left superficial femoral artery. (TR 591-93).

Medical Expert ("ME") Dr. Nafoosi testified at the October 6, 2006 hearing. (TR 640). Dr. Nafoosi testified that Plaintiff suffers from severe conditions Type II diabetes, hypertension with evidence of engorging damage, borderline cardiomegaly, disorder of the cervical spine supported by an August 2004 x-ray and bilateral shoulder rotator cuff tear requiring arthroscopic surgery. (TR

5

650-51). The doctor also noted a history of cannabis and alcohol use, noting that the cannabis was last used ten years ago and he did not think the alcohol use was severe or excessive and did not add a material component to his physical condition. (TR 650).

The doctor testified that Plaintiff had non-severe conditions dysthymia versus major depressive disorder, glaucoma and bronchitis. Dr. Nafoosi stated that the psychiatric impairment was non-severe because he did not require hospitalization for the condition, he was not receiving specialized psychiatric care and the doctor did not have a list of Plaintiff's medications. (TR 664). To the extent Plaintiff was being prescribed Lexapro by his family doctor, Dr. Nafoosi pointed out that she was not specialized in psychiatric care. (TR 664). The doctor testified that coronary artery disease is not medically determinable. (TR 650-51). The doctor testified that the RFC from the October 2002 decision did not include a disorder of the cervical spine or the cardiomegaly, therefore Plaintiff's condition had worsened since the prior decision. (TR 651-52). Dr. Nafoosi testified that Plaintiff's impairments would result in the work-related limitations as set forth in a Physical Residual Functional Capacity Assessment dated October 8, 2004. (TR 652). The October 8, 2004 examiner concluded that Plaintiff can occasionally or frequently lift and/or carry five pounds, stand and/or walk and sit about six hours in an eight hour day and was limited in upper extremity pushing and pulling, no reaching at chest height or higher, must avoid all exposure to vibrations and had limited near and far vision acuity. (TR 521-28). Dr. Nafoosi testified that he did not find objective medical evidence of neuropathy in the record evidence. (TR 656-58).

Dr. William Soltz testified as a medical expert at the continued hearing on March 15, 2007. Dr. Soltz concluded that Plaintiff has a "depressive condition diagnosed as either a dysthymia, a depressive disorder NOS or a major depression under 12.04." (TR 679). Dr. Soltz concluded that psychological testing did not reveal any major functional impairment and Plaintiff had mild

impairments in restrictions of activities of daily living and social functioning, moderate difficulties in maintaining concentration, persistence and pace and no episodes of decompensation. (TR 679-80, 682). Dr. Soltz stated that Plaintiff continues with the prior limitations, including no working around dangerous equipment or heights due to his medications, no involvement in highly intense interpersonal relationships, such as armed security or professional money collector, and no working in the security of others, such as elderly or children. (TR 682-83). The doctor twice noted that there was no evidence that Plaintiff's cognitive impairment materially affects his ability to function in the workplace. (TR 683, 690). He reported that Plaintiff has low average intelligence and some academic limitations, although his reading is sufficient. (TR 683, 690). The doctor noted that there was no test of memory but also noted no evidence that there was any material effect in that area. (TR 683). Dr. Soltz agreed that the GAF of 38 assigned by NMCMH in February 2007 was extremely low and unusual for a person living on his own and he does not see that GAF "in a person who's living outside an institution." (TR 586-87, 685).

      **C.**    **Vocational Expert**

The Vocational Expert (VE) stated that she agreed with Dr. Goldstein's prior assessment of Plaintiff's past laborer job as unskilled, medium exertion, and heavy as Plaintiff performed it. (TR 400, 403, 424, 718). The VE classified Plaintiff's past relevant work as a cashier/clerk as semi-skilled and light. (TR 719). The ALJ asked the VE to consider an individual with a high-school education and Plaintiff's work experience, limited to lifting no more than five pounds occasionally or frequently, pushing and pulling consistent with the weight limitation, able to walk or stand for two hours of an eight-hour work day, sit for eight hours of an eight-hour work day, with ability to change position at will, limited to occasional stair climbing, occasional balancing and crawling, occasional working over head bilaterally, no climbing ropes, ladders or scaffolding, must avoid

concentrated exposure to humidity and dust, should not work with vibratory tools or work with hazardous or fast-paced machinery or at unprotected heights, and has the ability to frequently kneel or crouch. (TR 719-20). The individual should also work in a "relatively habituated work setting, requiring no safety operations . . . should not have intense interpersonal contact with coworkers or supervisors" and should have limited public contact. (TR 720).

The VE testified that such an individual would not be able to perform Plaintiff's past relevant work and has no transferable skills. (TR 720). The VE testified that at the sedentary, unskilled level there are 500 sorter positions which Plaintiff could perform and 1,000 bench assembler positions. (TR 720). The VE testified that these jobs would be available even if the hypothetical individual were further restricted to no pushing or pulling with the upper extremity, no jobs requiring torque, power or impact tools and no assembly line work. (TR 720). The jobs would be available if the individual needed to raise his feet ten to twelve inches while seated, but the jobs would be eliminated if he needed to raise his feet to waist level. (TR 721). The VE further testified that if the individual had some vision, but not acute vision, he could still perform the jobs. (TR 722). The ALJ asked the VE to inform him if his testimony was different from the information in the Dictionary of Occupational Titles or the Selected Characteristics of Occupations. (TR 719).

**IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION**

The ALJ found that although Plaintiff met the disability insured status requirements through the September 30, 2007, had not engaged in substantial gainful activity since October 26, 2002 and suffered from Type II diabetes mellitus, hypertension with end organ damage including cardiomegaly, disorder of the cervical spine since August 2004, bilateral rotator cuff tear with surgical intervention, mild obesity and depression (major depression, mild versus dysthymia), all severe impairments, he does not have an impairment or combination of impairments that meets or

equals the Listing of Impairments. (TR 23-24). The ALJ found that Plaintiff's allegations regarding his limitations were not totally credible and although he could not perform his past work he has the ability to perform a limited range of sedentary work and there are a significant number of jobs in the economy which Plaintiff can perform. (TR 28-29). Therefore he is not suffering from a disability under the Social Security Act. (TR 29).

## V.   LAW AND ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir.

1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B. Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) he was not presently engaged in substantial gainful employment; and

(2) he suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his RFC, age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *See* §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that the ALJ's finding that Plaintiff's medical condition had not deteriorated after the October 2002 decision was not supported by substantial evidence, the ALJ did not properly

assess Plaintiff's credibility, the ALJ did not present an accurate hypothetical question to the VE and the ALJ did not show that there are jobs existing in significant numbers in the economy which Plaintiff can perform.

**C.     Analysis**

*1.     Whether The ALJ's Determination That There Was No Documented Deterioration Of Plaintiff's Physical Health Since The 2002 Decision Is Supported By Substantial Evidence*.

Plaintiff argues that the ALJ's finding that his physical health had not deteriorated since the October 2002 ALJ decision was not supported by substantial evidence. Plaintiff argues that the ME, Dr. Nafoosi, testified that the disorder of the cervical spine that was not present at the prior hearing and the chest x-ray for cardiomegaly would be "worsening" from what was provided for in the prior RFC. (TR 652). Dr. Nafoosi further testified that the depression was a new condition, but that he did not agree with the neuropathy condition. (TR 666). Plaintiff also argues that a physical examination showed reduced sensation to pinprick testing in the lower extremities consistent with peripheral neuropathy and a psychological evaluation rated Plaintiff's GAF at 50.

"When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *See Drummond v. Comm'r of Social Sec'y*, 126 F.3d 837, 842 (6th Cir. 1997). The Social Security Administration issued a Ruling which clarifies the application of *Drummond* in the Sixth Circuit.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding. AR 98-4(6), 1998 WL 283902 (June 1, 1998).

In the Agency's October 25, 2002 decision, ALJ Musseman found that Plaintiff suffered from a history of bilateral shoulder injuries status-post bilateral arthroscopy procedures, glaucoma and diabetes and Plaintiff had the RFC for a limited range of sedentary work[3]. (TR 67-68). The ALJ noted that since the 2002 decision, there "has been no documented deterioration of the claimant's physical health" and noted that Plaintiff has attained the age of 45 and changed from a younger individual age 18-44 to a younger individual age 45-49 and a change in age category constitutes "changed circumstances." (TR 21).

In his 2007 decision the ALJ found that Plaintiff has the RFC to perform a limited range of sedentary work and has the ability to lift, carry, push and/or pull a maximum of five pounds frequently and occasionally, he can stand and/or walk for two hours of an eight-hour work day and sit for eight hours with the need to change positions at will, he can occasionally climb stairs, balance and crawl but cannot climb ladders, ropes or scaffolding, kneel, crouch or work above chest level with either upper extremity. Plaintiff should avoid concentrated (occasional) exposure to humidity and dusts above those found at ground level, should avoid all vibrating, impact torque and power tools, cannot work with dangerous or fast machinery or work at unprotected heights and mentally, "he can work in a relatively habituated work setting that does not involve height production, height quota work or assembly line work," he cannot perform safety operations, he should not have intense interpersonal contact with co-workers and supervisors and he can have limited public contact. (TR 24).

The ALJ's statement that "there has been no documented deterioration" of Plaintiff's health

---

[3]Judge Musseman determined that Plaintiff has the ability to lift and carry up to five pounds, he cannot perform pushing or pulling and cannot repetitively extend or reach with his arms, cannot perform work above chest level, cannot operate power, impact, vibration or torque tools and cannot perform assembly line work or tasks requiring acute vision. (TR 67).

12

goes to the evidence related to Plaintiff's prior RFC.  Aside from the ambiguity of the ALJ's statement, the ALJ's RFC and findings otherwise address Plaintiff's "new" conditions including those mentioned by the ME and the ALJ's decision is supported by substantial evidence.  Plaintiff's argument implies than *any* finding of a deterioration in a claimant's condition should result in a finding of disability.  The ALJ properly evaluated new evidence in the record related to Plaintiff's conditions, including Plaintiff's depression, disorder of the cervical spinal, hypertension with end organ damage including cardiomegaly and mild obesity.  The ALJ also considered allegations of neuropathy.  At the October 2006 hearing Dr. Nafoosi disagreed with the diagnosis of neuropathy citing the lack of objective medical testing in the record.  The hearing was adjourned for the purpose of obtaining an examination and testing of that condition.

   On September 13, 2006 Michael D. Paulsell, M.D., noted that Plaintiff's symptoms crossed between neuropathy and ischemia and he has a "true ischemia of the lower left extremity." (TR 584).  Dr. Paulsell noted that Plaintiff has a severe peripheral vascular disease on the left that is complicated "by the fact of his continued smoking and his history of hypertension, diabetes, and hyperlipidemia." (TR 584).  Dr. Paulsell was awaiting the results of an MRA of Plaintiff's lower extremities.  (TR 584).  On December 8, 2006 Dr. Montasir performed a consultative physical examination on Plaintiff and stated that Plaintiff "seems to have peripheral neuropathy with numbness in both feet . . ., which seems to be related to intermittent claudication or peripheral arterial disease" but noted that Plaintiff had an MRA imaging test a month before the examination and did not yet have the results.  (TR 569).  On November 8, 2006 Jorge T. Gonzalez, M.D., examined Plaintiff for his complaints of bilateral lower extremity parethesias and reviewed the results and report of an EMG.  (TR 585).  Dr. Gonzalez noted that "[n]eedle examination of the lower extremities and related paraspinals was unremarkable." (TR 585).  The doctor concluded that

13

the "possibility of a mild generalized polyneuropthy is a consideration, although the electrodiagnostic findings do not fulfill diagnostic criteria for this diagnosis. There is no evidence for a significant lumbosacral radiculopathy, plexopathy, or mononeuropathy in either lower extremity." (TR 585). The ALJ's decision that neuropathy was not a severe impairment of Plaintiff's is supported by substantial evidence.

Although Plaintiff argues that Dr. Nafoosi testified that Plaintiff had some worsening of his condition due to the cardiomegaly and the disorder of the cervical spine, the doctor did not testify that the record supported greater restrictions as a result of the new conditions. Plaintiff has failed to cite any evidence showing limitations related to the cardiomegaly or disorder of the cervical spine greater than those found by the ALJ.

Plaintiff points out that on December 8, 2006 Nick Boneff, Ph.D., LP, performed a consultative psychological evaluation of Plaintiff and concluded that Plaintiff has a GAF of 50. (TR 579). A GAF of 50-60 "indicates moderate symptoms or moderate difficulty in social, occupational or school functioning." *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 463 (6th Cir. 2006) (Claimant had GAF scores in the range of 21 to 60, with the majority of scores falling within the 50s and claimant was not precluded from a wide range of work or his prior work.). "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 502 n.7 (6th Cir. 2006). ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data."). The ALJ cited extensively to the records containing the GAF scores, including records from the August 31, 2004 psychiatric consultative examination performed by Beth Clevenger, MA., LLP, a December 8, 2006

medical source statement completed by a licensed psychologist, reports and treatment notes from Northeast Michigan Community Mental Health Service dating from August 2004 through March 2007 and state agency reviews dated September 20, 2004. (TR 490-94, 498-515, 581-83, 617-39). None of these reports or notes support mental limitations greater than those found by the ALJ.

With respect to Plaintiff's depression, Dr. Nafoosi agreed with the limitations set forth in Dr. Joseph's September 2004 Mental Residual Functional Capacity Assessment and Psychiatric Review Technique form. (TR 498-515, 665-66). Dr. Joseph concluded that Plaintiff "is able to maintain sufficient concentration persistence pace (sic) to perform simple repetitive tasks on a regular [and] continuing basis." (TR 500). Dr. Joseph concluded that Plaintiff has mild limitations in activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace and no episodes of decompensation. (TR 512). The ALJ's RFC is more restrictive than Judge Musseman's findings, including with respect to Plaintiff's mental limitations and it is supported by substantial evidence in the record.

The weight limitations in Plaintiff's RFC are consistent with the October 2004 conclusions of an agency examiner, the ALJ's stand and/or walk limitations are more restrictive than those of the examiner and the ALJ's push/pull restrictions are less restrictive than those of the examiner. (TR 522). The ALJ did not make specific findings regarding whether Plaintiff's vision-related impairments had improved, however, this is harmless error because the VE specifically testified that a lack of acute vision would not impact her testimony regarding the available jobs. (TR 722). The ALJ's findings regarding Plaintiff's impairments and RFC are supported by substantial evidence.

*2.     Whether The ALJ's Credibility Determination Is Supported By Substantial Evidence*

Plaintiff argues that the ALJ improperly discounted Plaintiff's testimony because of noncompliance with his medication and that the records the ALJ cited to show non-compliance do

not show non-compliance. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Furthermore, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). In addition to objective medical evidence, the ALJ considered all the evidence of record in making his credibility determination. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

As an initial matter, without considering whether Plaintiff was compliant with his medication, the ALJ cited substantial evidence in the record to support his credibility determination. In making his credibility determination the ALJ noted the areas where the objective medical evidence did not support the severity of Plaintiff's complaints, including 5/5 strength in all muscle

16

groups, and a normal electromyography and cervical spine x-ray showing only mild stenosis and osteophytes at C5/6 without disc space narrowing. (TR 562, 585). The ALJ also noted the "absence of hallmark indications of pain such as reflex, sensory, and neurological deficits." (TR 26). *See Jones v. Sec'y of Health and Human Servs.*, 945 F.2d 1365, 1369-70 (6th Cir. 1991). The ALJ discussed Plaintiff's treatment for pain, including Toradol injections in the right shoulder, but noted the lack of any other pain treatment, including physical therapy, pain clinic treatment or other therapeutic treatment. (TR 26). Examination notes from April 2005 note that Plaintiff had no injections for an approximate three-year period following his shoulder surgery. (TR 551). The ALJ also examined Plaintiff's daily activities and pointed out that Plaintiff had engaged in part-time work from 2003 through 2005. (TR 25).

With respect to the ALJ's statement that Plaintiff was non-compliant with his medications, the record also supports this finding. Although the ALJ did not make the findings necessary to deny benefits on this basis, the non-compliance with medication and failure to follow the advice of the doctor was neither the sole basis for the ALJ's credibility determination nor the denial of benefits and income. *See* 20 C.F.R. §§ 404.1530 and 416.930; *Johnson v. Sec'y of Health and Human Servs.*, 794 F.2d 1106, 1113 (6th Cir. 1986). Although the note that Plaintiff had "Poor Control!" of his diabetes was ambiguous, the Court disagrees that there is ambiguity to the note from Alcona Health Center stating that "pt needs to be med/diet compliant!!" (TR 541, 547). In addition, Plaintiff was repeatedly advised to stop smoking. (TR 430, 541, 547, 550, 556, 565). In January 2005 it was noted that Plaintiff's blood sugar was high because he was out of Glucophage. Plaintiff argues that allowing a medication to run out without refill is not non-compliance. There is no accompanying explanation for why Plaintiff allowed the Glucophage to lapse. (TR 552). In November 2004 the provider noted "stress med compliance" and again between December 2004 and January 2005 a

17

notation with respect to Plaintiff's diabetes states "really stress med compliance." (TR 553, 556). Contrary to Plaintiff's argument, these notations are not ambiguous and they reasonably indicate that the treatment provider perceived a need to address Plaintiff's compliance with medication. During this time period Plaintiff was also repeatedly advised that he needed an eye exam. (TR 541, 547, 548, 553). Two additional notes appear with Plaintiff's psychiatric treatment notes indicating that Plaintiff lost his prescription for an antidepressant and did not give his antidepressants "a full trial." (TR 599, 605). The ALJ's finding that Plaintiff was noncompliant with medications is supported by substantial evidence in the record. Based upon the foregoing, the Court concludes that substantial evidence supports the ALJ's credibility assessment.

### *3.      Whether The ALJ Met His Burden At Step 5*

#### *a.      Whether The ALJ Presented An Accurate Hypothetical Question To The VE*

Finally, Plaintiff argues that the hypothetical question to the VE was inaccurate and that the ALJ failed to meet his burden at step five to identify a significant number of jobs which Plaintiff can perform. In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ presented all of the limitations of the RFC in his hypothetical question to the VE and the VE testified that such an individual would not be capable of performing Plaintiff's prior work, but that there are jobs available for a person with these limitations. (TR 720). Plaintiff's attorney questioned the VE about the production requirements of the assembly and sorting positions and the VE testified that the assembly jobs did not require an interdependency that would be a major factor. (TR 724). The ALJ asked the VE, "[i]f I was to say no pushing and pulling with the upper extremities, no jobs requiring torque or use of power tools or impact tools, . . . , and no assembly line work, would those jobs still be

18

available?" (TR 720). The VE testified that the jobs would be available. (TR 720). The VE also testified that neither job, sorter nor bench assembler, required work above chest level or acute vison. (TR 722-23). As set forth above, the ALJ's RFC for a restricted range of sedentary work is supported by substantial evidence, the ALJ included those limitations in his hypothetical question and follow-up questions to the VE and the ALJ properly relied on the VE's testimony.

### b.      *Whether The ALJ Showed That There Are Jobs Existing In Substantial Numbers In The Economy Which Plaintiff Can Perform*

Finally, the ALJ did not err in finding that 1,500 was a significant number of jobs available. Although there is no "magic number" which constitutes a significant number of jobs, the VE testified without qualification that Plaintiff could perform these jobs and gave specific numbers in which the jobs are available in the economy. *See Hall v. Bowen*, 837 F.2d 272, 274-75 (6th Cir. 1988) (finding that 1,350 to 1,800 jobs is a significant number of jobs available). There is no challenge to the reliability of the VE's testimony nor any other reason to discount the ALJ's reliance on the VE's testimony regarding the number of available jobs. The ALJ's findings at step five are supported by substantial evidence.

### VI.     CONCLUSION

The Commissioner's decision is supported by substantial evidence, was within the range of discretion allowed by law and there is insufficient evidence for the undersigned to find otherwise. Accordingly, Defendant's Motion for Summary Judgment (docket no. 22) should be GRANTED, that of Plaintiff (docket no.16) DENIED and the instant Complaint DISMISSED.

### REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in

28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: June 04, 2009                 s/ Mona K. Majzoub
                                     MONA K. MAJZOUB
                                     UNITED STATES MAGISTRATE JUDGE



**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: June 04, 2009                 s/ Lisa C. Bartlett
                                     Courtroom Deputy